IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

STANDARD STEEL, LLC, )
       Plaintiff, )
)
       vs )  Civil Action No. 08-195
)
NAUTILUS INSURANCE COMPANY, )
       Defendant. )

MEMORANDUM OPINION AND ORDER

MITCHELL, Magistrate Judge:

Presently before the Court is the defendant's motion to dismiss Count III of the amended complaint or, in the alternative, to dismiss or strike the plaintiff's demands for consequential damages and expert fees in Count III. For reasons discussed below, the defendant's motion to dismiss Count III of the amended complaint (Document No. 22) will be denied, and its alternate motion to dismiss or strike the plaintiff's demands for consequential damages and expert fees in Count III (Document No. 22) will be granted.

The plaintiff, Standard Steel, LLC ("Standard Steel"), has filed a three-count amended complaint against defendant Nautilus Insurance Company ("NIC") for breach of contract (Count I), declaratory judgment (Count II), and bad faith pursuant to 42 Pa.C.S.A. § 8371 (Count III). The Court's diversity jurisdiction is properly invoked.

Standard Steel alleges:

> This is a lawsuit for breach of contract and bad faith arising out of the failure and refusal of NIC to honor obligations that -- pursuant to NIC liability insurance policy number BK0002002-1 ("the Policy") -- it owed

to Standard Steel in connection with a train derailment caused by a faulty railcar axle that Standard Steel had manufactured. The aforementioned derailment resulted in substantial damage to property owned by Canadian National Railway ("CNR"), Mitsui Rail Capital ("Mitsui") and American Coal ("AmCoal"), for which CNR requested recompense from Standard Steel.[1]

Standard Steel contends that NIC failed to abide by its obligations under the Policy to defend or indemnify it in connection with property damage suffered as a result of the derailment, which forced Standard Steel to expend its own money to investigate and settle the derailment claim.[2]

The record shows that on or before July 1, 2005, Standard Steel purchased from NIC the Policy, which provides commercial general liability insurance for the period July 1, 2005 to July 1, 2006.[3] In pertinent part, the Policy provides that:

* NIC "will pay those sums that the insured becomes legally obligated to pay as damages because of ... 'property damage' to which this insurance applies";

* NIC has "the right and duty to defend the insured against any 'suit' seeking those damages"; and

* NIC "may, at [its] discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result."

See, Policy at Section I, ¶1.a.

---

1. See, amended complaint at ¶ 1.

2. Id. at ¶¶ 2-3.

3. Id. at ¶ 12. NIC has attached a copy of the Policy as an exhibit in support of its motion to dismiss. Our review of the Policy does not convert the defendant's Rule 12(b)(6) motion to one for summary judgment, for "a defendant may supplement the complaint by adding exhibits such as public records and other indisputedly authentic documents underlying the plaintiff's claims." Sentinel Trust Co. v. Universal Bonding Ins. Co., 316 F.3d 213, 216 (3d Cir. 2003).

In addition, the Policy includes an endorsement which provides that:

> \* NIC's "obligation to pay any amount within the Limits of Insurance for the coverage provided ... will apply only in excess of a Self-Insured Retention ["SIR"] layer of $750,000."

See, Policy at SIR Endorsement SC-2308-O. The Policy also provides that:

> \* "No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent."

See, Policy at Section IV, ¶2.d.

In its amended complaint, Standard Steel makes the following allegations: it makes wheels and axles for the railway industry.[4] On or about June 4, 2006, a CNR coal train derailed between Jackson, Mississippi and Mobile, Alabama which destroyed 24 "hopper" cars owned by Mitsui, spilled approximately 3,170 tons of coal belonging to AmCoal, and caused damage to the track.[5] Standard Steel subsequently investigated the cause of the derailment, and it concluded the derailment was caused by the in-service failure of an axle which it improperly manufactured.[6] Following the derailment, CNR -- on behalf of itself, Mitsui and AmCoal -- presented Standard Steel with a claim in excess of $2,275,000 for damages resulting from the incident.[7] Standard Steel tendered the claim to NIC and provided it with substantial information regarding the derailment, including an internal report prepared by Standard Steel's in-house

---

4. See, amended complaint at ¶ 4.

5. Id. at ¶¶ 8-9.

6. Id. at ¶¶ 10-11.

7. Id. at ¶ 16.

expert and a memorandum summarizing its analysis of the costs submitted by CNR.[8]

On or about December 21, 2006, Aon Risk Services ("Aon") wrote a letter to NIC on Standard Steel's behalf, requesting that NIC consent to Standard Steel's payment of its $750,000 SIR to CNR, so Standard Steel could maintain relations with that valued customer.[9] By letter dated December 28, 2006, NIC informed Standard Steel it would grant said request, with the understanding that the $750,000 SIR payment to CNR was not an admission of liability, nor a final resolution of the claim.[10]

Although Standard Steel provided NIC with substantial information on the derailment, NIC issued a letter dated May 3, 2007 (nearly a year after the derailment occurred), acknowledging that Standard Steel's axle was defective, but denying any responsibility for the claim; NIC believed there was insufficient evidence to show what role the axle played in the derailment, but it did not point to any other definitive cause of it.[11] Following NIC's denial of the claim, Standard Steel, through Aon, submitted additional information to NIC and asked it to reconsider its position, but by letter dated September 11, 2007, NIC again denied responsibility for the claim.[12] NIC also denied requests from Standard Steel and Aon to meet with CNR to discuss its position.[13]

---

8.  Id. at ¶¶ 17-18.
9.  Id. at ¶ 20.
10. Id. at ¶¶ 21-22.
11. Id. at ¶¶ 23-26.
12. Id. at ¶¶ 27-28.
13. Id. at ¶¶ 29-31.

Faced with mounting pressure from its customer, CNR, and by virtue of NIC's denial of responsibility for the claim, Standard Steel advised NIC it would attempt to resolve the claim directly with CNR, reserving the right under the Policy to be reimbursed for amounts it paid to resolve the claim.[14] By letter dated September 24, 2007, NIC informed Standard Steel that any payments it made in excess of its SIR would be deemed voluntary payments and not reimbursed by NIC.[15]

In its amended complaint, Standard Steel contends that NIC materially breached the Policy by failing to abide by its obligations for the derailment claim and declaring it was not obligated to reimburse Standard Steel for amounts it expended to investigate and settle the claim (Count I). NIC is said to have acted in bad faith by unreasonably denying Standard Steel's claim and attempting to leverage for its own benefit the commercial relationship between CNR and Standard Steel (Count III). In its prayer for relief in Count III, Standard Steel seeks consequential damages, interest, punitive damages, costs, attorneys' fees and expert fees.

NIC moves to dismiss the bad faith claim in Count III for failure to state a viable claim. It argues that there can be no claim for bad faith refusal to settle a third party claim where there is no excess verdict, as here, and the insured settles a claim without the insurer's consent in violation of the Policy. In the alternative, NIC moves to dismiss or strike Standard Steel's demands for consequential damages and expert fees in Count III, on grounds that such relief is not authorized by 42 Pa.C.S.A. § 8371.

In reviewing a motion to dismiss, all well-pleaded allegations of the complaint

---

14. Id. at ¶¶ 32-33.

15. Id. at ¶ 34.

must be accepted as true and viewed in a light most favorable to the non-movant. <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976). To survive a motion to dismiss, a complainant's "[f]actual allegations must be enough to raise a right to relief above the speculative level." <u>Bell Atlantic Corp. v. Twombly</u>, 127 S.Ct. 1955, 1965 (2007). A complaint will be dismissed if it does not plead "enough facts to state a claim to relief that is plausible on its face." <u>Id.</u> at 1974.

In 42 Pa.C.S.A. § 8371, it is provided:

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

 (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

 (2) Award punitive damages against the insurer.

 (3) Assess costs and attorney fees against the insurer.

To ultimately prevail on a bad faith claim under § 8371, a plaintiff must show that: (1) the insurer lacked a reasonable basis for denying benefits under the policy; and (2) the insurer knew or recklessly disregarded its lack of a reasonable basis in denying the claim. See, <u>Northwestern Mut. Life Ins. Co. v. Babyan</u>, 430 F.3d 121, 137 (3d Cir. 2005); <u>Terletsky v. Prudential Property & Cas. Ins. Co.</u>, 649 A.2d 680, 688 (Pa.Super. 1994), <u>alloc</u>. <u>denied</u>, 659 A.2d 560 (Pa. 1995). The term "bad faith" under the statute includes an insurer's frivolous or unfounded refusal to pay proceeds of a policy, as well as a lack of good faith investigation into the facts. <u>Brown v. Progressive Ins. Co.</u>, 860 A.2d 493, 501 (Pa. Super 2004).

While "mere negligence on the part of the insurer is insufficient to constitute bad faith; [an insurer's] recklessness... can support a finding of bad faith." <u>Polselli v. Nationwide</u>

Mutual Fire Ins. Co., 23 F.3d 747, 751 (3d Cir. 1994). To evince bad faith, "[t]he insured must ultimately show that 'the insurer breached its duty of good faith through some motive of self-interest or ill will'". Babyan, supra, 430 F.3d at 137, quoting Brown, supra, 860 A.2d at 501.

In support of its bad faith claim, Standard Steel avers that NIC engaged in a claims handling strategy that was designed to exert severe economic duress on it, place it in an untenable position with its valued customer, CNR, and minimize NIC's exposure under the Policy for the derailment claim, as evidenced by these acts: (1) NIC disavowed Standard Steel's defective axle as the cause of the derailment without offering any other explanation for its cause; (2) it delayed and ultimately avoided any resolution of CNR's derailment claim; and (3) it manipulated Standard Steel into a position where it either would have to force CNR to file suit against it, or it would have to resolve the claim without the benefit of its insurance and insurer.

In moving to dismiss Count III, NIC argues there can be no claim for bad faith refusal to settle a third party claim where no excess verdict has been entered. Tellingly, NIC fails to cite Pennsylvania case law with that express holding. In Birth Center v. St. Paul Companies, 787 A.2d 376, 382, 384-85 (Pa. 2001), the Pennsylvania Supreme Court rejected an insurer's argument that payment of an excess verdict bars an insured's bad faith claim, but the Court did not opine that an excess verdict is a prerequisite to a statutory bad faith claim. Certainly, the statute itself contains no such language.

NIC relies on Daniel P. Fuss Builders-Contractors, Inc. v. Assurance Co. of America, 2006 WL 2372226 (E.D.Pa., Aug. 11, 2006), where the Court rejected the plaintiff's interpretation of Birth Center, supra, to the extent it claimed Birth Center eliminated the prerequisite of an excess verdict to establish a bad faith claim for unreasonable failure to settle a

third party claim. Id. at *4. Pennsylvania law imposes no such prerequisite.

In Fuss Builders, the issue was whether an insured could assert a bad faith claim against its insurer for delaying settlement of a third party claim where the claim was ultimately settled within policy limits and without the entry of an excess verdict. Id. at *4. The Court in Fuss Builders held that Pennsylvania law does not recognize a cause of action against an insured for delaying settlement of a third party claim. Id. at *5. This Court has held otherwise. See, Gideon v. Nationwide Mutual Fire Ins. Co., 2008 WL 768724, *9 (W.D.Pa., Mar. 20, 2008), where Judge Cohill acknowledged the above holding in Fuss Builders, but disagreed with it ("We simply disagree with the analysis of the issue by our sister court"). Absent Pennsylvania case law or statutory text which supports NIC's position that an excess verdict is a condition precedent to a statutory bad faith claim for failure to settle a third party claim, we do not impose such a requirement here.

NIC also presses for dismissal of the bad faith claim on grounds that Standard Steel settled the derailment claim over NIC's objection and in contravention of the terms of the Policy. In response to this argument Standard Steel asserts that a statutory bad faith claim must be analyzed by focusing on the acts of the insurer, not the insured. Indeed, the Pennsylvania Supreme Court has stated that § 8371 "provides a remedy in an action 'arising under an insurance policy' as to a claim an insured has made of his insurer." Toy v. Metropolitan Life Ins. Co., 928 A.2d 186, 200 (Pa. 2007). As explained in Toy: the term "bad faith" in § 8371 "capture[s] those actions an insured [takes] when called upon to perform its contractual obligations of defense and indemnification or payment of a loss that failed to satisfy the duty of good faith and fair dealing implied in the parties' insurance contract." Id. at 199-200.

Standard Steel also avers that it settled the derailment claim with CNR only after NIC engaged in its bad faith acts recited above. Having alleged that NIC unreasonably denied its claim and engaged in acts to leverage for its own benefit the commercial relationship between Standard Steel and CNR, Standard Steel has stated a viable bad faith claim. Thus, NIC's motion to dismiss Count III is denied.

In the alternative, NIC moves to dismiss or strike Standard Steel's demands for consequential damages and expert fees in Count III. Standard Steel asserts that this motion should be denied as moot, because at a May 2008 case management conference with opposing counsel, counsel clarified that Standard Steel is only seeking those damages authorized by the bad faith statute. Standard Steel asserts, however, that to the extent expert fees comprise a part of the damages it seeks to collect, its claim for those fees should not be stricken.

Pennsylvania's bad faith statute, 42 Pa.C.S.A § 8371, "authorizes courts, which find that an insurer has acted in bad faith toward its insured, to award punitive damages, attorneys' fees, interest and costs." Birth Center, 787 A.2d at 386. The Pennsylvania Supreme Court has counseled that while § 8371 does not alter an insured's common law contract rights, an insured may not recover compensatory damages based on § 8371. Ash v. Continental Ins. Co., 932 A.2d 877, 884 (Pa. 2007). Also see, Birth Center, 787 A.2d at 390 (Nigro, J. concurring) (stating that pursuant to a statutory bad faith claim, an insured may recover only those damages specifically set forth in § 8371, i.e., punitive damages, attorney fees, court costs and interest). Also see, Jurinko v. Medical Protective Co., 2006 WL 1791341, *11 (E.D.Pa., June 23, 2006) (stating that privately-retained expert fees are not recoverable as costs under § 8371).

We will grant NIC's alternate motion. An appropriate Order will be entered.

## O R D E R

AND NOW, this 17th day of September 2008, for the reasons set forth in the Court's Memorandum Opinion,

IT IS ORDERED that the defendant's motion to dismiss Count III of the amended complaint (Document No. 22) is denied, and that its alternate motion to dismiss or strike the plaintiff's demands for consequential damages and expert fees in Count III (Document No. 22) is granted.

s/ ROBERT C. MITCHELL<br>
United States Magistrate Judge